NOTICE

Decision filed 03/09/21 The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180187-U

NOS. 5-18-0187, 5-19-0290 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| H.B.D. CONSTRUCTION, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | |
| | ) | |
| ECO JAZZ, INC.; THE HOUSING AUTHORITY OF THE | ) | |
| CITY OF EAST ST. LOUIS a/k/a The East St. Louis | ) | |
| Housing Authority; PEOPLE'S VENTURES, LLC; | ) | |
| SWANSEA BUILDING PRODUCTS CORP.; MPM | ) | |
| INDUSTRIES, INC.; DAVID J. HYDE & ASSOCIATES, | ) | |
| INC.; ROSCH COMPANY, LLC; BETHALTO GLASS, | ) | |
| INC.; KING O'TILES, INC.; LORENZ AND | ) | Nos. 14-CH-561 & |
| ASSOCIATES, INC.; TOWN & COUNTRY MASONRY | ) | 14-L-588 |
| AND TUCKPOINTING, LLC; EAST LAKE/CENTRAL | ) | |
| CITY, L.P.; ESL DEVELOPMENT CORPORATION, NFP; | ) | |
| EAST LAKE MANAGEMENT & DEVELOPMENT | ) | |
| CORP.; EAST LAKE MANAGEMENT GROUP, INC.; | ) | |
| COLE TAYLOR BANK; ST. CLAIR COUNTY TRUSTEE; | ) | |
| RAVEN SECURITIES, INC.; ACPRODUCTS, INC.; | ) | |
| and Unknown Owners, Trustees, and Lien Claimants, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Town & Country Masonry and Tuckpointing, LLC, and | ) | |
| The Housing Authority of the City of East St. Louis a/k/a | ) | Honorable |
| The East St. Louis Housing Authority, | ) | Stephen P. McGlynn, |
| Defendants-Appellants). | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

1

**ORDER**

¶ 1  *Held*: The trial court's orders granting mechanic's liens to the appellee, H.B.D. Construction, Inc., and the various subcontractors on property developed into a mixed-use senior living facility are vacated where there was insufficient evidence in the record to make this determination. We remand for an additional hearing focused on this issue. We affirm the court's damage award to the appellant, Town & Country Masonry and Tuckpointing, LLC, against HBD as it was not against the manifest weight of the evidence. We affirm the court's denial of Town & Country's request for attorney fees in accordance with the attorney fee provision in its subcontractor agreement with HBD.

¶ 2  The appellant, the East St. Louis Housing Authority (ESLHA), appeals various orders entered by the circuit court of St. Clair County granting mechanic's liens in connection with labor and materials furnished by the appellee, H.B.D. Construction, Inc. (HBD), on a multi-use facility in East St. Louis. The appellant, Town & Country Masonry and Tuckpointing, LLC (Town & Country), appeals the amount of damages awarded to it against HBD in connection with its masonry work that it completed as a subcontractor on this project, the court's denial of its request for attorney fees, and the court's denial of its claim under the State Prompt Payment Act (30 ILCS 540/0.01 *et seq.* (West 2018)). For the following reasons, we vacate the trial court's orders granting the mechanic's liens on the subject property, vacate the order denying Town & Country's claim for a lien on public funds, and remand for further proceedings. We affirm the court's award of damages to Town & Country, its denial of Town & Country's request for attorney fees, and its denial of Town & Country's claim under the State Prompt Payment Act.

2

¶ 3                              I. BACKGROUND

¶ 4                    A. The Eco Jazz Construction Project

¶ 5    The dispute involves the construction of a three-phase project referred to by the parties as the Jazz and Mixed Use Senior Living at Walter Circle (project) on property designated as parcels 1, 2, 3, and 4 in East St. Louis, Illinois. Eco Jazz, Inc. (Eco), was a not-for-profit corporation organized under the laws of Illinois with its principal place of business in St. Clair County. It was created specifically to be the sole owner and developer of the property. The ESLHA was a municipal corporation that operated as a federally funded housing program with its principal place of business in St. Clair County. Eco and the ESLHA were the owners of the property that was being developed; the ESLHA owned parcels 1, 2 and 3, and Eco owned parcel 4. The property consisted of a vacant lot with three abandoned houses on it.

¶ 6    The ESLHA and Eco entered into a 99-year ground lease where the ESLHA, as landlord, leased parcel 1, part of parcel 2, and parcel 3 to Eco, as tenant, for the specific purpose of developing the property and operating a mixed-use senior living facility. In addition to the senior living facility, there was a commercial aspect of the project that included a grocery store, medical office, commercial-grade catering kitchen, and a stage for a jazz club. The Jazz at Walter Circle project was the first phase of the project. The project involved the construction of two residential buildings, each of which had four stories, which were referred to as building 1 and building 2. The first floor of each building was used for commercial purposes and the remaining floors consisted of the senior housing apartment units. Signature Program Management oversaw the development and managed

3

the project for Eco. The project was funded by a mix of funds from the U.S. Department of Housing and Urban Development (HUD) and from private investors.

¶ 7 On February 23, 2011, after Eco entered into its lease with the ESLHA, Eco entered into a separate written agreement with HBD, a corporation organized under the laws of Missouri and authorized to do business in Illinois, for HBD to be the general contractor on the project. HBD entered into a subcontract with Town & Country, a counterplaintiff in this suit, for labor, material, and services with regard to the masonry portion of the project. Town & Country was a Missouri limited liability company engaged in the business of furnishing brick laying, masonry, tuckpointing, and other services commonly used by general contractors in the construction of brick-sided facilities. The original masonry contract was between HBD and Town & Country for $1,309,037; the scope of work was later split between Town & Country and Peebles Masonry (Peebles), with Peebles being responsible for building 2. Town & Country was allocated 49% of the work, and Peebles was allocated 51% of the work.

¶ 8 On or about August 15, 2013, HBD substantially completed the project and turned over the second, third, and fourth floors for occupancy. On or about December 31, 2013, HBD turned over the first floors for occupancy.

¶ 9 The project suffered from a number of cost overruns and construction delays, resulting in significant issues of dispute between HBD and Eco. Also, several of the subcontractors on the project were not paid for their work, which resulted in numerous mechanic's liens being placed on the property.

4

¶ 10                        B. The Trial Court Proceedings

¶ 11    On July 10, 2014, HBD filed a four-count complaint against, *inter alia*, Eco and the ESLHA, bringing the following causes of action: breach of contract, *quantum meruit*, enforcement of a mechanic's lien, and violation of the Contractor Prompt Payment Act (815 ILCS 603/1 *et seq.* (West 2012)).  With regard to the breach of contract claim, HBD alleged that on February 23, 2011, it entered into two separate written contracts with Eco where HBD agreed to act as the general contractor on the project and to provide materials and labor to Eco for the construction of the mixed-use facility plus any extra work that may be agreed upon.  In exchange for the work, Eco agreed to pay HBD the reasonable value of the materials and labor provided by HBD and HBD's subcontractors as set forth in the contract.  During the course of the project, HBD provided materials and labor that were used in the construction of the project in accordance with the terms of the contract.  However, despite repeated demands, Eco failed and refused to pay the balance of $3,876,761.25 that was due.  HBD requested that it be awarded the outstanding balance under the contract, attorney fees, prejudgment interest, and court costs.  As for the *quantum meruit* claim, HBD alleged that it had conferred a benefit on Eco and the ESLHA as all of the materials and labor charged to them were used in the construction of the project and retention of that benefit without payment would be unjust.

¶ 12    With regard to the claim involving the enforcement of the mechanic's lien, HBD asserted that on May 1, 2014, it filed a contractor's claim for lien in the St. Clair County Recorder of Deeds office against the property.  HBD requested that the trial court enforce the lien by declaring it superior to any other lien or interest on the property, force a sale on

5

the property to satisfy the debt, and order the defendants jointly and severally liable for any deficiency remaining after the sale. HBD also alleged that Eco's failure to pay for the construction labor and materials violated section 10(1) of the Contractor Prompt Payment Act (*id.* § 10(1)) and that, pursuant to section 15(a) of the Contractor Prompt Payment Act (*id.* § 15(a)), Eco is liable to HBD for the full amount due plus interest at the rate of 10% per annum.

¶ 13    On August 25, 2014, Town & Country filed[1] a counterclaim against HBD. In its counterclaim, it noted that on or about May 5, 2014, it served a combined subcontractor's notice of claim of lien on public funds and claim on bonds on, *inter alia*, the ESLHA, HBD, and Eco, claiming that it completed its work on March 31, 2014, but was still owed money under its subcontractor agreement with HBD. Notice was given pursuant to both the lien on public funds law (770 ILCS 60/23 (West 2012)) and the Public Construction Bond Act (30 ILCS 550/1, 2 (West 2012)). Town & Country asserted that, under the contract, it was owed $955,181.04 for furnished labor, materials, and services but was only paid $774,653.12. Thus, it was still owed $180,527.92. Town & Country had made repeated demands for payment. In count I of the counterclaim, Town & Country requested judgment on the payment bond as well as prejudgment interest, attorney fees, and court costs. In count II, which was titled lien on public funds accounting, Town & Country alleged that the ESLHA held $180,527.92 in public funds that were owed to Town & Country and

---

[1]Town & Country was named in HBD's suit against Eco and the ESLHA as an entity that had a mechanic's lien on the property. See *Park Avenue Lumber & Supply Co. v. Nils A. Hofverberg, Inc.*, 76 Ill. App. 2d 334, 345 (1966) (the Mechanics Lien Act contemplates one action; all persons who are known to have an interest, either legal or equitable, in the land must be joined as parties).

requested that the trial court order the ESLHA to provide an accounting of the public funds under its control for the construction of the project and then order the ESLHA to pay Town & Country what was owed for its work on the project. In count III, Town & Country sought enforcement of its subcontractor's lien filed on May 12, 2014.

¶ 14 On November 10, 2014, HBD filed a first amended complaint, asserting similar claims against Eco as those raised in the initial complaint but added various other lien claimants and other parties who could claim an interest in the property. Lorenz and Associates, Inc., which was a corporation organized under the laws of Missouri and had recorded a mechanic's lien against the property in the amount of $39,646, was named as a defendant in the first amended complaint. King O'Tiles, Inc., which was a Missouri corporation and had a recorded mechanic's lien against the property in the amount of $47,417.35, was also named as a defendant. Bethalto Glass, Inc., which was an Illinois corporation and had recorded a mechanic's lien against the property in the amount of $31,448, was named as a defendant.

¶ 15 On December 23, 2014, the defendant Vee-Jay Cement Contracting Co., Inc. (Vee-Jay), a Missouri corporation, who was granted leave to intervene in the case, filed a counterclaim and cross-claim, requesting a mechanic's lien against the property because HBD owed it $70,571 for labor and materials that it furnished on the project.

¶ 16 On March 3, 2017, Town & Country filed a motion for partial summary judgment on count I of its counterclaim (judgment on the payment bond) against HBD, claiming that there were no genuine issues of material fact in dispute as to the issue of whether it was entitled to payment under the bond. On April 26, 2017, the trial court entered an order,

7

finding that Town & Country had established that it was entitled to payment under the payment bond but that questions of fact remained as to the amount that was owed. The court then stated that the matter would be set for hearing to prove up the amount due as well as attorney fees.

¶ 17    The trial court bifurcated the claims into a two-stage trial; HBD's claims proceeded to a two-week trial in May 2017, and Town & Country's counterclaims regarding the amount of damages were presented on August 16, 17, and 21, 2018.[2]

¶ 18    On December 28, 2017, after all of the evidence was presented on HBD's claims, the trial court entered an order resolving HBD's claims against Eco. In the order, the court noted that it previously dismissed HBD's claim for equitable relief under the theory of *quantum meruit*. On the remaining counts, the court entered judgment in favor of HBD and against Eco and awarded HBD $3,301,843.25 in total contract damages. The court also found that HBD was entitled to attorney fees and interest on damages and a mechanic's lien on the property in the amount of the judgment. The court ordered counsel to submit proposed interest and attorney fees calculations within 21 days.

¶ 19    The trial court also found in favor of Lorenz and Associates, King O'Tiles, and Vee-Jay with regard to their claims against HBD. The court found that the subcontractors should have been paid through HBD's performance bond when it was realized that payment from Eco was going to be delayed. The court entered judgment in favor of King O'Tiles in the amount of $16,070, judgment in favor of Lorenz and Associates in the amount of

---

[2]To avoid unnecessary repetition, the relevant evidence presented at the trials and the additional procedural posture will be set forth in section II as needed to address the parties' claims on appeal.

8

$16,370, and judgment in favor of Vee-Jay in the amount of $45,651. The court also found that the subcontractors were entitled to interest and attorney fees and ordered counsel to submit calculations on those within 21 days. The court noted that this was not a final and appealable order and that a final and appealable order would set out the "amount of interest and attorney fees approved."

¶ 20    On February 15, 2018, the trial court entered an order reiterating that it was finding in favor of HBD with regard to its claims against Eco and ordering Eco to pay HBD interest in the amount of $1,482,995.47 (the total judgment amount against Eco was $5,181,295.36). Thereafter, Eco filed a timely notice of appeal of the court's August 26, 2015, and March 8, 2017, orders in which the court denied its motion to dismiss based on *res judicata*.[3] It did not appeal the amount of the judgment award entered against it.

¶ 21    On June 21, 2018, the ESLHA filed motions to dismiss HBD's and the various subcontractors' mechanic's lien claims on the property pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)) for failure to state a claim. In the motion, the ESLHA noted that the property at issue was publicly owned land as the ESLHA was a governmental body (a municipal corporation) and argued that mechanic's liens were not enforceable against publicly owned land. On August 16, 2018, the trial court entered an order denying the ESLHA's motion to dismiss, finding that Eco had entered into a 99-year lease with the ESLHA and that real property subject to a mechanic's lien on a leasehold interest of 99 years could be foreclosed upon and sold.

_____

[3]This appeal was docketed as 5-18-0187. On September 9, 2019, Eco's June 26, 2018, appellate brief was withdrawn, and it did not file a substitute brief. Thus, Eco is not part of this decision.

¶ 22    On July 20, 2018, the trial court entered an order amending its December 28, 2017, order.  In this order, the court granted the subcontractors' requests for HBD to pay their attorney fees in the following amounts: King O'Tiles was awarded $20,681.60 in attorney fees; Lorenz and Associates was granted $20,576.90 in attorney fees; and Vee-Jay was granted $24,636.38 in attorney fees.

¶ 23    On August 8, 2018, Town & Country filed an amended counterclaim against HBD, adding count IV, which requested interest under section 7(b) of the State Prompt Payment Act (30 ILCS 540/7(b) (West 2018)) for HBD's failure to make full payment of the amounts due under the subcontract agreement.

¶ 24    On May 23, 2019, the trial court entered an order, granting King O'Tiles a mechanic's lien against the property in the amount of $47,414.35 as well as $24,873.34 in prejudgment interest (for a total of $72,287.69), Lorenz and Associates a mechanic's lien in the amount of $39,646 and $25,033.08 in prejudgment interest (for a total of $64,679.08), and Vee-Jay a mechanic's lien in the amount of $70,571 and $35,723.03 in prejudgment interest (for a total of $106,294.03).  That same day, the court also entered an order granting Bethalto Glass a mechanic's lien against the property in the amount of $48,651.68 ($29,948 and $18,703.68 in prejudgment interest).  The court also granted HBD a mechanic's lien on the property.

¶ 25    On May 24, 2019, the trial court entered an order, stating that its February 15, 2018, order in favor of HBD included an amount of $88,474[4] and interest for subcontract work

---

[4]HBD agreed that it owed Town & Country $88,474 but disagreed that it owed any more than that.

performed by and materials supplied by Town & Country for the project that had not previously been paid and was still due under the contract. The court noted that the previous order did not fully address and resolve the remaining issues between HBD and Town & Country with respect to damages in excess of $88,474, Town & Country's claim that HBD violated the State Prompt Payment Act, and Town & Country's request for attorney fees.

¶ 26 On June 12, 2019, after all of the evidence was presented on the amount due to Town & Country, the trial court entered an order granting Town & Country a mechanic's lien against the property. In the order, the court noted that HBD acknowledged that it still owed Town & Country $88,474, but Town & Country asserted in its pleadings that HBD owed $138,796 plus interest and attorney fees. The court also noted that, after the evidence was presented on the amount of damages, Town & Country claimed that HBD owed "even more than that." The court noted that most of the difference between the figures involved the acquisition of platinum bricks originally approved for the project but then were rejected by Signature Management for aesthetic reasons. Town & Country claimed it purchased the platinum bricks for $51,030 and was entitled to an additional markup of $3572 for a total amount of $54,602; HBD denied that Town & Country paid for the brick. The court noted that the evidence at trial demonstrated that the rejected brick had been delivered to the project. The court also noted that Town & Country had maintained that another brick and masonry contractor on the job site, Peebles, was overpaid by HBD and that overpayment was of funds that were owed to Town & Country for services and supplies it provided and performed on the project.

11

¶ 27    The trial court found that Town & Country had not produced any cancelled checks or other similar evidence establishing that it paid for both the rejected bricks and the replacement bricks but was only reimbursed for one.  The court also found that the most reliable evidence and payment analysis was that of HBD.  Thus, the court found for Town & Country on count I of its counterclaim and against HBD in the amount of $88,474 plus interest at 5% annum commencing March 31, 2014.  The court also concluded that Town & Country was not entitled to attorney fees under its contract with HBD because neither party was considered a prevailing party as defined by the contract.  As for count II of Town & Country's counterclaim, which requested a lien on public funds held by the ESLHA, the court noted that it was "shocked by the cavalier nature in which millions of dollars were transferred out of [the] accounts on this project without meaningful oversight."  However, the court stated as follows:

> "[Town & Country] failed to establish that any funds were held by [the ESLHA] at the important times in question to enter judgment against [the ESLHA] or otherwise impose a lien on its present funds.  While Count II reads to request equitable relief, *i.e.*, an accounting as well as damages, the court is satisfied that the combination of witnesses and evidence produced by [the ESLHA] provided adequate information to determine if it had at any relevant time in this controversy funds to pay [Town & Country] for uncompensated work, services and materials on the Eco Jazz project."

¶ 28    As for count III of the counterclaim, which sought to impose a mechanic's lien on the property, the trial court granted Town & Country's request for a mechanic's lien in the amount of the judgment.  The court, finding that Eco failed to pay Town & Country on a timely basis without just cause or right, awarded Town & Country a judgment against Eco in the amount of $88,474.  The court also awarded Town & Country attorney fees against

12

Eco and gave counsel 10 days to submit an updated accounting of attorney fees and costs. As for count IV, which claimed a violation of the State Prompt Payment Act (30 ILCS 540/0.01 *et seq.* (West 2018)), the court found that HBD had "reasonable cause to pay out when it did and how much it did" to Town & Country. The court concluded that "all the delays and shortchanging lies [*sic*] directly at the feet of Signature Management and Eco Jazz." Therefore, the court announced that it was denying the relief sought in count IV. The court also denied the ESLHA's motions to deny Town & Country's requested mechanic's lien on the property.

¶ 29    On June 21, 2019, the trial court entered an order, imposing a mechanic's lien on the property in the amount of $5,764,108.67.

¶ 30    On July 2, 2019, the trial court entered another judgment order on Town & Country's counterclaim as follows: (1) the court entered judgment in favor of Town & Country on count I of its counterclaim and against HBD in the amount of $88,474 plus 5% prejudgment interest of $23,003.23, for a total judgment of $111,477.33, and postjudgment interest at 9% accruing from June 13, 2019; (2) the court entered judgment against Town & Country on count II of the counterclaim; (3) the court entered judgment in favor of Town & Country and against Eco on count III of the counterclaim in the amount of $88,474, plus 10% prejudgment interest of $46,005.79, postjudgment interest at 9% accruing from June 13, 2019, and attorney fees and costs in the amount of $100,275.23; (4) the court concluded that the mechanic's lien on the property totaled $234,755.02; (5) the court denied the ESLHA's motions to deny Town & Country a mechanic's lien on the property; and (6) the court entered judgment against Town & Country on count IV of its counterclaim.

¶ 31    On July 12, 2019, the ESLHA filed a timely notice of appeal[5] from the trial court's May 23, 2019, order granting King O'Tiles, Lorenz and Associates, and Vee-Jay mechanic's liens against the property; the court's May 23, 2019, order granting Bethalto Glass a mechanic's lien against the property; the court's May 23, 2019, order denying Eco's motion for judgment on the pleadings as to HBD's State Prompt Payment Act claim; the court's June 12, 2019, order granting Town & Country a mechanic's lien against the property; the court's June 21, 2019, order on count III (enforcement of the mechanic's lien) of HBD's first amended complaint; the court's July 2, 2019, order granting Town & Country attorney fees and costs, imposing a mechanic's lien against the property, and denying its motions to deny Town & Country's mechanic's lien; and the court's December 28, 2017, order resulting in the February 15, 2018, judgment granting HBD's mechanic's lien on the property.  On July 30, 2019, Town & Country filed a notice of appeal[6] from the court's June 12, 2019, and July 2, 2019, orders.

¶ 32                                    II. ANALYSIS

¶ 33                              A. The ESLHA's Appeal

¶ 34    The ESLHA's sole contention on appeal is that the trial court erred in granting HBD's and the various subcontractors' mechanic's liens against publicly owned property. The ESLHA asserts that it was undisputed that it was a municipal corporation; that it was the fee simple owner of the property; and that the property was used for a public purpose, *i.e.*, to develop affordable housing.  Accordingly, because HBD entered into a contract for

---

[5]This appeal was initially docketed as 5-19-0290 but was later consolidated with 5-18-0187.
[6]This appeal was also initially docketed as 5-19-0290 but was later consolidated with 5-18-0187.

public improvement of publicly owned property, the mechanic's liens were not enforceable against the subject property. In contrast, HBD disputes that the ESLHA was the fee simple owner of the property and that the purpose of the contract between HBD and Eco was for public improvement. Rather, HBD contends that the contract was between two private entities (HBD and Eco) for commercial purposes. In support of its argument that the ESLHA was not the legal owner of the property, HBD cites *Matot v. Barnheisel*, 212 Ill. App. 489, 494 (1918), which found that a lease for a period of 99 years constituted the owner of the property under section 1 of the Mechanics Lien Act (Act) (770 ILCS 60/1 (West 2018))

¶ 35    Section 1 of the Act states as follows regarding mechanic's liens:

> "Any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land or for the purpose of improving the tract of land, or to manage a structure under construction thereon, is known under this Act as a contractor and has a lien upon the whole of such lot or tract of land and upon adjoining or adjacent lots or tracts of land of such owner constituting the same premises and occupied or used in connection with such lot or tract of land as a place of residence or business ***." *Id.*

The purpose of the Act is to permit a lien upon premises where a benefit has been received by the owner and where the value or condition of the property has been increased or improved by the furnishing of labor and materials. *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 164 (1998).

¶ 36    Section 23 of the Act addresses the procedure and requirements to perfect a mechanic's lien for work performed on a construction project for a public entity. When

15

dealing with the public improvement construction on publicly owned property, section 23(b) of the Act instructs as follows:

> "Any person who shall furnish labor, services, material, fixtures, apparatus or machinery, forms or form work to any contractor having a contract for public improvement for any county, township, school district, city, municipality, municipal corporation, *or any other unit of local government in this State*, shall have a lien for the value thereof on the money, bonds, or warrants due or to become due the contractor having a contract with such county, township, school district, municipality, municipal corporation, or any other unit of local government in this State under such contract. The lien shall attach only to that portion of the money, bonds, or warrants against which no voucher or other evidence of indebtedness has been issued and delivered to the contractor by or on behalf of the county, township, school district, city, municipality, municipal corporation, or any other unit of local government as the case may be at the time of the notice." (Emphasis added.) 770 ILCS 60/23(b) (West 2018).

¶ 37    Section 23 allows subcontractors of a general contractor employed by a public body to establish a lien on funds in the possession of the public body. *R.W. Dunteman Co.*, 181 Ill. 2d at 164. "Section 23 is materially different from all other liens established under the Act in that it is the sole remedy of a subcontractor against a public body." *Id.* at 164-65. Thus, the language of section 23(b) only permits a subcontractor a lien attaching to the public funds and not to the real property. See *Aluma Systems, Inc. v. Frederick Quinn Corp.*, 206 Ill. App. 3d 828, 841 (1990) (section 23 of the Act allows for a lien on funds used for public improvement, rather than upon the land where the building is located).

¶ 38    However, to fall within the purview of section 23, the furnished work must be for public improvement projects for any county, township, school district, city, municipality, municipal corporation, or any other unit of local government in the state. Section 23(a-5) of the Act defines "unit of local government" to include, *inter alia*,

16

"any entity, other than the State, organized for the purpose of conducting public business pursuant to the Intergovernmental Cooperation Act or the General Not For Profit Corporation Act of 1986, or where a not-for-profit corporation is owned, operated, or controlled by one or more units of local government for the purpose of conducting public business." 770 ILCS 60/23(a-5) (West 2018).

The Act does not define public improvement or public business, although some case law interpreting the definition of "local public entity" in the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-206 (West 2018)) may be instructive. See *Carroll v. Paddock*, 199 Ill. 2d 16 (2002). However, the trial court here, when it granted the various mechanic's lien claims against the subject property instead of the public funds, did not address the issue of whether Eco would fall within the definition of a "unit of local government."

¶ 39    While HBD and the subcontractors refer to Eco as a private entity and the project as a private project, this conclusion cannot be reached based on the record before us. The trial in this matter was focused on the details of the construction project itself, rather than Eco's corporate structure and its relationship with the ESLHA. The record reveals that (1) the project used HUD financing in planning the project for the purpose of "community development revitalization"; (2) the project is "mixed use" because it combines residential and commercial aspects; (3) the project is "mixed funding" because it combines public financing and private investment; (4) Eco is a not-for-profit corporation that was described at trial as "an offshoot" of the ESLHA; (5) the ESLHA "set up Eco" as owner and developer of the project as a "special purpose non-profit affiliate of the ESLHA"; (6) Elizabeth Tolliver, the executive director of the ESLHA, is on the board of directors of Eco; and (7) the residential aspects of the project provide subsidized housing for low

17

income seniors in East St. Louis. However, much is absent from the record as to the nature of Eco and the project, such as (1) its articles of incorporation; (2) its bylaws; (3) its management structure; (4) the nature of the income generated by the property, in both its commercial and residential aspects; and (5) who receives that income. While the trial court was correct to deny the motion to dismiss the mechanic's lien claims of HBD and the subcontractors due to these questions of fact, the court erred when it entered judgment on the lien claims without sufficient evidence on these issues. Thus, pursuant to Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), which gives this court the authority to make any order that the case may require, we remand for a further hearing on these issues. See *Amgro, Inc. v. Johnson*, 71 Ill. App. 3d 485, 490 (1979) (the reviewing courts have broad powers of remandment); see also *Pepper Pot II, Inc. v. Imperial Realty Co.*, 133 Ill. App. 3d 951, 955 (1985) (where the record discloses that all of the evidence on a material issue has not been produced, it is appropriate for the reviewing court to remand for a hearing for further evidence). For these reasons, we vacate the orders that entered judgment on the mechanic's liens and remand with directions that the trial court determine, after an evidentiary hearing, the issue of whether this was a project for public improvement and whether Eco meets the definition of "unit of local government" set forth in the Act.

¶ 40     Moreover, we believe that further directions to the trial court would be instructive. If the court finds that this was a public project and Eco met the definition of "unit of local government," it is important to note that section 23(b) only gives the subcontractors a lien on public funds due to HBD. See *Aluma Systems, Inc.*, 206 Ill. App. 3d at 841 (a public mechanic's lien is available only to subcontractors, as it is a lien upon the funds awaited

18

by, and due to, the original contractor). If the court finds that Eco is not a "unit of local government" and this was not a public project, HBD and the subcontractors are not entitled to a lien on the fee of the subject property. While the *Matot* case does hold that a 99-year lessee of property is an "owner" for purposes of section 1 of the Act, section 1 also provides that the lien "extends to an estate in fee, for life, *for years*, or any other estate or any right of redemption or other interest *that the owner may have in the lot or tract of land at the time of making such contract*." (Emphases added.) 770 ILCS 60/1(a) (West 2018). Thus, the mechanic's liens, if awarded, should only be liens on Eco's 99-year leasehold interest in the property.

¶ 41                     B. Town & Country's Appeal

¶ 42                        1. *Damages Award*

¶ 43    Town & Country first contends that the trial court's decision on the amount of damages that it was entitled is against the manifest weight of the evidence.

¶ 44    Where a damage award is made after a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence. *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented. *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 142. "An award of damages is not against the manifest weight or manifestly erroneous if there is an adequate basis in the record to support the trial court's determination of damages." *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 13.

19

¶ 45    Here, it was undisputed that, at the time of trial, HBD had paid Town & Country $808,330.31 under the subcontract.  However, the dispute at trial involved the additional amounts that were allegedly owed to Town & Country for its work on the project; Town & Country calculated that amount as $138,796, and HBD calculated that amount as $88,474 (the difference between those amounts is $50,322).  Town & Country also claims that it was owed an additional amount of $61,317.50 for materials purchased by Town & Country but were used on Peebles' portion of the project (building 2).

¶ 46    The following testimony was offered at trial in regard to these calculations.  Kowert testified that he prepared a document titled "Analysis of Town & Country and Peebles Masonry Account Balances," which was an ongoing document as to his calculations of the outstanding monies HBD owed to Town & Country (HBD exhibit 184).  In calculating the amount due, he utilized a final accounting provided by Town & Country.  He testified that he also attended several meetings with Town & Country to reconcile the amount owed to Town & Country.  He testified that HBD and Town & Country agreed that Town & Country was owed $896,804.06 for its work on the project but that Town & Country believed that it was owed an additional amount; it believed that it was owed a total amount of $947,126.  He provided the following explanation for his accounting and the variances between his final accounting and Town & Country's.  He noted that there was a variance between Town & Country's and HBD's final accounting for $16,886 for "case stone sills remake"; he explained that they both had it listed as being paid in the amount of $16,886 to Town & Country, but the item was listed in a different location on the parties' respective calculations.  He noted that Town & Country's final accounting included $3365 for a

20

dumpster enclosure, but it never did that work, and it was completed by other contractors. HBD's final accounting included back charges for $1923.94 and $7125 for labor that was supplied by HBD but was within Town & Country's scope of work and for expenses that were paid by HBD but were actually Town & Country's expenses. There was a back charge of $228 for three yards of concrete to re-pour a sidewalk damaged by Town & Country.

¶ 47    Kowert's accounting also included a $556.62 charge for HBD's overhead for the back charges at the rate of 5%. Kowert explained that Town & Country's final accounting included $25,000 in remobilization charges that had been denied by HBD and a $4500 charge for additional time that was spent by Town & Country on overseeing the remobilizations but was also denied by HBD. He also explained that Town & Country's final accounting included a $285 charge and a $203 charge for profit and overhead that had already been paid. There was a $91 charge on Town & Country's final accounting that was not included on his accounting. He also explained that Town & Country included a charge of $1173 for work that was part of the contract scope, but Town & Country had invoiced the charge as an extra. There was a $3572 charge on Town & Country's final accounting for claimed overhead and profit on charcoal grey brick for which it previously provided an executed lien waiver. There was also a $2300 charge that was part of the base contract and not an extra. After considering those variances, he calculated that HBD still owed $88,474 under the subcontract. He acknowledged that his final accounting was prepared shortly before trial, and he had not given Town & Country any notice about the back charges that he was claiming.

¶ 48    Kowert testified that Town & Country's president, Jeff White, had executed a lien waiver for $51,030 on the work completed that involved the charcoal grey brick. He testified that HBD jointly paid Town & Country and many of their suppliers because the suppliers cut off Town & Country, and joint payee checks provided them a credit so that the suppliers would continue to supply the materials. He also stated that HBD had advanced money to Town & Country and that HBD was always out of pocket on Town & Country's account because Town & Country was a smaller company and did not have working capital.

¶ 49    Kowert acknowledged that Town & Country was "heavy" on materials at the beginning of the project, but it was reconciled to "shift it away" from Town & Country and make the material suppliers be paid through Peebles. He testified that Peebles paid about $250,000 to material suppliers; he did not believe that Town & Country was aware of how much of the materials was paid by Peebles. He explained that HBD exhibit 197, which was prepared in 2013, showed that reconciliation. He also explained that HBD attempted to make it as close to the 49%/51% split as possible to make it fair. He acknowledged that, for example, with regard to supplier Kirchner Brick, $103,000 was paid to that supplier by Town & Country and only $16,000 was paid to that supplier by Peebles. He explained that although Town & Country paid the majority of the costs from this supplier, HBD rectified that by having Peebles pay more for the costs of another primary supplier. For instance, he noted that Peebles paid Swansea Brick $121,434.

¶ 50    Deborah Harshany testified that her job responsibilities as Town & Country's comptroller included preparing the pay applications for the project and preparing and

22

submitting the change order requests. Harshany testified that she did not know about the back charges that were included in HBD's final accounting and that she was surprised to see those back charges because it was so long ago. She created a spreadsheet to list the pay applications, the payments, and change order requests to calculate the amount due to Town & Country. She believed that HBD still owed Town & Country $138,796 on the subcontract.

¶ 51 Harshany testified that when she submitted pay applications to HBD, it was not customary for HBD to pay those in full; she explained that Town & Country submitted 15 pay applications to HBD, but HBD made 40 payments toward those 15 applications. She explained that the payments for the 15 payment applications should have been 15 payments and 2 payments of retainage. She noted that the way that HBD submitted payments never made sense to her. She did acknowledge that in construction, sometimes subcontractors were not paid exactly what was asked for in the pay applications. She acknowledged that on January 22, 2013, a lien waiver in the amount of $51,030 had been executed in connection with the grey brick, which indicated that that amount had been paid to Town & Country.

¶ 52 David Jackson, an expert in the area of HUD funding who was brought on board the project by Eco, testified that he was the owner's representative on the project. He left the project when Walter Circle was approximately 90% complete. At the time that he left the project, Town & Country was still owed money under its subcontractor's agreement. After being notified by Town & Country that it was owed money, on December 4, 2012, he emailed his client about the outstanding balance. There was also an email exchange on

December 13 between him, Ken Kayes from HBD, and Kowert notifying HBD that money was still owed to Town & Country and that Eco was concerned as to why no payment had been made. He testified that he was concerned that Town & Country might be paying too much for brick since the contract had been split between Town & Country and Peebles and that he was trying to find out whether Town & Country was owed any money for materials. On January 18, 2013, he attended a meeting with Kowert; Jeff White, the president of Town & Country; and Olatunde Ogundeko, an Eco agent, in which they discussed the amount due Town & Country. He explained that it appeared that Town & Country was paying for all of the materials and that Peebles was getting paid far more than Town & Country for work and for the majority of the materials being used on both buildings. He testified that everyone at the meeting agreed that Town & Country was owed a little over $200,000. The white board notes from that meeting were admitted into evidence.

¶ 53    Jackson testified that HUD had given the City of East St. Louis, through the ESLHA, $32 million to develop housing. He explained that HUD had "earmarked" $22 million for the Walter Circle project and another $13 million for a second housing project that was started but not finished. The project was also funded with private funds. At the end of his involvement with the project, the project had a little over $12 million in its account to be utilized for the second phase. He explained that he personally saw the $12 million deposited into the account. He noted that the money was under Eco's control. When he left the project, only about $100,000 had come out of that account.

¶ 54    Elizabeth Tolliver, the executive director of the ESLHA, testified that the ESLHA received Town & Country's notice of claim on lien for public funds in the amount of

$180,527.92. She testified that Eco was a special purpose non-profit affiliate of the ESLHA. She agreed that a balance sheet statement for Eco's checking and savings accounts reflected a total amount of $581,250.94 on June 30, 2014. She stated that, before construction, approximately $12 million from HUD was transferred into Eco's checking account.

¶ 55 White testified that HBD received its last payment from Eco on the masonry portion of the contract on August 19, 2013, and that a total of $1,541,607 was paid under HBD's contract with Eco for the masonry. However, Town & Country had not been paid in full under its subcontractor's agreement. He testified that Town & Country began working on the project on December 1, 2011, and completed its work on March 31, 2014; Town & Country did work that was supposed to be completed by Peebles. He testified that in addition to the $138,796 that was owed to Town & Country for building 1, HBD also owed Town & Country $61,317.50 for materials Town & Country paid for but were used for building 2. He explained that building 2 was not Town & Country's responsibility. He confirmed that the contract was initially a single contract with Town & Country, but it was later split assigning responsibility for 51% of the masonry work to Peebles and 49% to Town & Country. He testified that Town & Country exhibit 30, which was a paid invoice report, included a check register that showed how much Town & Country paid its vendors for the project. It also included two-party checks written by HBD to pay what was owed to Town & Country but for which HBD used to pay for materials used on building 2; the two payees on the checks were Town & Country and a material supplier. White explained that Kowert would not pay the invoiced amount because he was overpaying Peebles.

25

Kowert had given White checks, but those checks were conditional on White paying for the materials. White testified that his endorsements of those two-party checks and the lien waivers were under duress.

¶ 56    White testified about Town & Country exhibit 33, which was the lien waiver for the $51,030; he noted that out of the $51,030, only $6000 was made payable to Town & Country as a single payee. The rest was split into six other two-party checks where a material supplier's name was typewritten in as a second payee. The two-party checks included the added names of Richard Brick for $15,000; Swansea Brick for $14,800; Raineri for $9000; Irwin for $2000; and Fabrick for $2000. White explained that although he had endorsed the two-party checks, he did not retain possession of them or deposit them into Town & Country's bank account; Kowert kept the checks to pay for the materials for building 2. White calculated that Town & Country overpaid for materials as follows: $49,026.66 for brick; $9271.10 for mortar; and $3019.74 for hardware. In January 2013, he emailed Kowert informing Kowert that he felt that Town & Country was being "held hostage" to pay for materials for building 2.

¶ 57    White testified that Town & Country made two claims for delay damages: $40,290 and $25,000. He testified that HBD approved the $40,290 and that amount was included in the $138,796 that was owed. The $25,000 was part of the additional $61,370.50 that he believed was owed.

¶ 58    On cross-examination, he acknowledged that, on February 14, 2017, after Town & Country finished its involvement on the project, he had claimed that Town & Country was owed $163,471.45. He also acknowledged that the spreadsheet completed by Harshany

26

indicated that the amount owed to Town & Country was $138,796 and that the spreadsheet was prepared just prior to the hearing. He further acknowledged that his amended answer and counterclaim had alleged that $138,796 was owed to Town & Country. He admitted that under the subcontractor agreement, Town & Country was required to provide HBD with seven days written notice of any claims for delay damages and that Town & Country did not provide written seven days' notice of these claims. He did not know how much money Peebles paid for materials on the project.

¶ 59 After hearing all of the testimony and considering the evidence, the trial court entered an order, stating as follows with regard to the amount of damages owed to Town & Country:

> "This court has examined thousands of documents, invoices, spreadsheets, flow charts, and pictures. This court has also listened to multiple witnesses and, of course, entertained arguments of counsel.
>
> HBD acknowledges that [Town & Country] is still owed $88,474. [Town & Country] asserts in its pleading it is owed $138,796 plus interest and attorney's fees, although after evidence was presented, [Town & Country] argues it is owed even more than that.
>
> Most of the difference between HBD and [Town & Country] involves the acquisition of platinum bricks originally approved for the project but then rejected by Signature Management for aesthetic reasons demanding a charcoal grey brick be used instead. Town & Country claim[s] it purchased the platinum grey brick for $51,030 and was entitled to an additional mark up of $3572 for a total amount of $54,602. HBD denies [Town & Country] paid for this brick. However, the evidence at trial demonstrated that this rejected brick had been delivered to the project.
>
> On January 22, 2013, [Town & Country] executed a waiver of lien for 'masonry at Jazz at Walter Circle' in the amount of $51,030.
>
> [Town & Country] also maintains that another brick and masonry contractor on the site, Peebles, was overpaid by HBD and that over-payment was of funds that were owed to [Town & Country] for services and supplies it provided and performed on the project.

27

[Town & Country] has not produced cancelled checks or other similar evidence establishing that it paid for both platinum grey bricks and for charcoal grey bricks but was only reimbursed for one.

The Court finds the most reliable evidence and payment analysis was that of HBD. The Court finds [Town & Country] on Count I is entitled to a judgment against HBD *** in the principal amount of $88,474 plus interest at 5% per annum commencing [March 31, 2014]."

¶ 60 After carefully reviewing the record, we find that the trial court's decision concerning the amount of damages was not against the manifest weight of the evidence. Both parties submitted prepared spreadsheets to justify the amount that they believed was owed to Town & Country for its work on this project. Both parties had witnesses testify as to how they determined the outstanding amount due, the variances between each party's calculation, on how payments were made from HBD to Town & Country, and on the lien waiver and circumstances surrounding the brick. The court heard White's testimony in which he calculated the amounts that Town & Country overpaid for various materials, was presented with cancelled checks from Town & Country that showed the amounts paid for materials, was presented with a spreadsheet created by Harshany that detailed the amounts for labor and materials that Town & Country contributed to the project, and heard Jackson's testimony that he believed that Town & Country had overpaid on the project and on the conclusions that were made following the meeting with Town & Country to resolve the overpayment issue. There was nothing in the record to indicate that the court did not consider this evidence. Instead, the court found that HBD's evidence and payment analysis were just more reliable. As the trier of fact, the trial court is in the best position to assess the credibility of witnesses, resolve inconsistencies, determine the weight to assign the testimony, and draw reasonable inferences therefrom. *People v. Daheya*, 2013 IL App

28

(1st) 122333, ¶ 61. The trial court's credibility determinations "must be given great deference because the trial court, as the trier of fact, is in an optimum position to observe the demeanor of witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive." *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App. 3d 146, 153 (1998). A reviewing court should not overturn a trial court's finding merely because it might have reached a different conclusion. *1472 N. Milwaukee, Ltd.*, 2013 IL App (1st) 121191, ¶ 13. Given that the role of the trial court is the trier of fact, and we find no basis in the record to second-guess the court's judgment, we find that the court's decision as to the amount of damages owed to Town & Country was not unreasonable or arbitrary and that there was an adequate basis in the record to support that decision. Accordingly, we affirm the trial court's determination of the amount of damages owed to Town & Country.

¶ 61                                    2. *Attorney Fees*

¶ 62    Town & Country next argues that the trial court abused its discretion by not awarding it attorney fees under the subcontractor agreement.

¶ 63    The decision whether to award attorney fees is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991). Typically, attorney fees are the responsibility of the party who incurred the fees. *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 510 (2005). However, attorney fees can be awarded in construction cases where the construction contract contains specific language regarding the allocation of attorney fees. *Id.*; *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 86. The

29

construction of an attorney fee provision in a contract is a question of law. *Fontana*, 362 Ill. App. 3d at 510. A court is required to strictly construe a contractual provision for attorney fees. *Bjork v. Draper*, 381 Ill. App. 3d 528, 544 (2008).

¶ 64 Here, the attorney fee provision in Town & Country's subcontract with HBD provided as follows:

> "9.5. Attorney fees and Expenses—In any dispute resolution proceedings or other legal action, including but not limited to applications to confirm or vacate and appeals thereof, between the parties relating to this Agreement, the prevailing party shall recover from the other party all reasonable attorneys' fees, consultants costs and other expenses, including but not limited to litigation and arbitration filing fees and arbitrator compensation, in connection with such action. The prevailing party is a party who recovers at least 75% of its total claims in the action, or who is required to pay no more than 25% of the other party's total claims in the action."

¶ 65 During oral argument, Town & Country acknowledged that if this court affirmed the trial court's damages award of $88,474, then it did not meet the first prong of the attorney fee provision (recovery of at least 75% of its total claims). However, Town & Country contends that it was entitled to attorney fees under the second prong of that contractual provision (required to pay no more than 25% of the other party's total claims in the action) because it was not ordered to pay any of the judgment awarded to HBD. In response, HBD contends that Town & Country is not considered a prevailing party because HBD's claims were not brought against Town & Country. HBD argues that absent the Act, which required Town & Country to be named in HBD's suit against Eco and the ESLHA, HBD would not have named Town & Country as a party in the litigation.

¶ 66 The trial court denied Town & Country's request for attorney fees under the subcontract, finding that in the litigation between HBD and Town & Country, neither party

30

was a "prevailing party" as defined under the subcontract. The dispute between HBD and Eco was not a dispute between HBD and Town & Country pursuant to their contract. Rather, Town & Country was named as a necessary party due to the claims under the Act. Thus, the fact that Town & Country was required to pay "no more than 25%" of HBD's total claims against Eco is not relevant to the analysis. The only dispute between HBD and Town & Country relating to their agreement was Town & Country's counterclaim, and as to that counterclaim, neither party was a "prevailing party." To require HBD to pay Town & Country attorney fees based on HBD's claims against Eco would be a result that was not contemplated by the contract between HBD and Town & Country. Accordingly, the trial court did not abuse its discretion in finding that Town & Country was not entitled to attorney fees under the attorney fee provision in the agreement.

¶ 67    Town & Country next contends that pursuant to section 7.6.8 of the underlying general contract agreement between Eco and HBD and 2.4.1 of the subcontractor agreement,[7] attorney fees awarded to Town & Country should be passed through to HBD's judgment against Eco. However, we find that Town & Country was not a "prevailing party" as defined by the subcontract agreement and thus was not entitled to attorney fees.

¶ 68                    3. *Lien on Public Funds*

¶ 69    Town & Country next contends that the trial court erred in denying count II of its counterclaim to assert a lien on public funds held by the ESLHA or its agent in accordance

---

[7]Section 7.6.8 of the general contract included a fee-shifting clause making attorney fees and costs reimbursable by a prevailing party in a dispute between HBD and Eco. Section 2.4 of the subcontratctor contract provided that the subcontract document included the general contractor agreement between HBD and Eco.

31

with section 23 of the Act (770 ILCS 60/23 (West 2018)). This is similar to the argument raised by the ESLHA in section II.A. of this decision. For the reasons set out in that section of our decision, we vacate the order denying Town & Country's claim for a lien on public funds and remand with the same directions.

¶ 70                                4. *State Prompt Payment Act*

¶ 71    Lastly, Town & Country contends that the trial court erred in not awarding it damages for HBD's violation of the State Prompt Payment Act. Section 7(b) of the State Prompt Payment Act states as follows:

> "If the contractor, without reasonable cause, fails to make full payment of amounts due under subsection (a) to its subcontractors and material suppliers within 15 calendar days after receipt of payment from the State official or agency, the contractor shall pay to its subcontractors and material suppliers, in addition to the payment due them, interest in the amount of 2% per month, calculated from the expiration of the 15-day period until fully paid. This subsection shall further apply to any payments made by subcontractors and material suppliers to their subcontractors and material suppliers and to all payments made to lower tier subcontractors and material suppliers throughout the contracting chain." 30 ILCS 540/7(b) (West 2018).

Here, count IV of Town & Country's amended counterclaim included its claim alleging that HBD had violated the State Prompt Payment Act. However, during HBD's cross-examination of one of Town & Country's witnesses at the second stage of the trial, Town & Country indicated that it was withdrawing its motion for leave to amend its counterclaim adding a prompt pay claim. Counsel further stated that there would not "be a Prompt Pay Act case on [its] cutoff." HBD's counsel then abandoned a line of questioning concerning this claim. After all of the evidence was presented, the following colloquy occurred between HBD's counsel, Town & Country's counsel, and the trial court:

32

"[TOWN & COUNTRY'S COUNSEL]:  There is one other piece *** of bookkeeping that we need to straighten out.  I think it was the first day *** unbeknownst to me Judge McGlynn had entered an order granting my motion for leave to amend.

[HBD'S COUNSEL]:  Right.

[TOWN & COUNTRY'S COUNSEL]:  And I didn't know that at the time. So I imagine right now we still have a Prompt Pay Act case.

[HBD'S COUNSEL]:  I thought you withdrew it during the case.

[TOWN & COUNTRY COUNSEL]: At the time it had already been granted, so I can't withdraw the motion to amend when it's already been granted. And, frankly, given the evidence that we've been able to produce, we want to make it.  And so I'll either—I need to just straighten it out.  If you need me to file motion for leave to file an amended complaint to conform to the proofs I will, but I just want to know what *** we need to do and what—maybe the Court can give us some guidance on that.

[HBD'S COUNSEL]: Well, I had the court order before the hearing started on Thursday.  You were down a line of questioning that I was asking about the 50-some-thousand dollars.  You then said 'I'm withdrawing my prompt payment claim.'

[TOWN & COUNTRY'S COUNSEL]: I understand that.  That's why it's a mess *** because *** I did not know that it had already been granted.

[HBD'S COUNSEL]:  It's not a mess to me.  You withdrew the claim and so I dropped the line of questioning and didn't pursue anything further on that.  I didn't think you were withdrawing the motion.  I thought you said I'm withdrawing my prompt payment claim.  And since the amendment had already been granted, you are now pulling it.  That's how I understood what you said and because of that [I] didn't proceed with any further questioning.  Nor do I think there's any evidence to demonstrate that, in fact, *** $50,000 was paid to HBD for Town & Country's work, and they in turn didn't pay it.

[TOWN & COUNTRY'S COUNSEL]: I think there's evidence that you guys got paid by the end of December 13 everything of the masonry part of it. That came in today.  I think, you know, I don't know what line of questioning you were pursuing, but I believe you were pursuing it with Deb Harshany, and—

THE COURT: I'm going to be ruling on the—you need to file whatever motions you want to file with respect to the significance of your oral motion to withdraw your Prompt Payment Act claim.  I did not enter an order—I have now written an order with respect to that motion.  I will contemplate whether or not I think the defendant *** is prejudiced by not pursuing a line of questioning on that because you said you were going to orally amend it.  I think I've got all the numbers and facts and figures to figure out who got paid when, who is properly accounted for, all the moving parts in this project, and who might be confused.  So I don't know that ultimately that you're going to be prejudiced, Mr. McGovern [(HBD's counsel)], if I do grant his *** motion."

33

In its June 12, 2019, order, the trial court stated as follows:

> "During the course of the evidentiary hearing on this claim, counsel for [Town & Country] announced [it] was withdrawing this count which lead counsel for HBD to abandon a line of questioning of [Town & Country's] witnesses on this issue. Thus, HBD's argument that [Town & Country] waived the right to pursue this particular claim is a strong one."

Like the trial court, we find that HBD's argument that Town & Country forfeited its right to pursue this particular claim when it indicated that it was abandoning this claim during the hearing on Town & Country's damages is a strong one. As a result of Town & Country's withdrawal of this claim, HBD's counsel abandoned a line of questioning concerning this issue and did not pursue any further questioning on the claim. Accordingly, we find that Town & Country's abandonment of the State Prompt Payment Act claim at the trial resulted in forfeiture of that claim.

¶ 72                            III. CONCLUSION

¶ 73    For the foregoing reasons, we vacate the circuit court of St. Clair County's orders, which granted HBD and the subcontractors' mechanic's liens on the subject property and denied count II of Town & Country's counterclaim, which sought a lien on public funds held by the ESLHA. We remand for an evidentiary hearing focused on the issue of whether this was a project for public improvement and whether Eco meets the definition of "unit of local government" set forth in the Act. We affirm the court's award of damages to Town & Country in the amount of $88,474, its denial of Town & Country's request for damages under the State Prompt Payment Act, and its denial of Town & Country's request for attorney fees.

¶ 74    Affirmed in part and vacated in part.
        Cause remanded with directions.